(C. D. 1663)

SHOZO SAITO *v.* UNITED STATES

United States Customs Court, Third Division

(Decided December 9, 1954)

*Lawrence & Tuttle* (*Jacob L. Klingaman, Walter I. Carpeneti, Charles F. Lawrence,* and *George R. Tuttle* of counsel) for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*Harold L. Grossman, Mollie Strum, William J. Vitale,* and *Dorothy C. Bennett,* trial attorneys), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: This protest involves three jade articles, described on the invoice as an incense burner, a Buddhist statue, and a pair of jade screens, respectively. They were imported from Japan via Wake and Honolulu, arriving at the port of San Francisco on

July 19, 1950, where consumption entry was filed, claiming free entry as artistic antiquities, produced prior to 1830, under paragraph 1811 of the Tariff Act of 1930. The collector rejected the claim and classified the objects as articles in chief value of semiprecious stone, assessing duty at 25 per centum ad valorem under paragraph 233 of said tariff act, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and the President's proclamation of May 4, 1948, T. D. 51909. He also levied additional duty at the rate of 25 per centum ad valorem under section 489 of said act as articles rejected as unauthentic in respect to the antiquity claimed.

The protest claims that the articles are entitled to free entry under paragraph 1811 and are not subject to additional duty under section 489.

The pertinent provisions of the tariff act are as follows:

PAR. 233 [as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and the President's proclamation of May 4, 1948, T. D. 51909]. All articles composed wholly or in chief value of agate, rock crystal, or other semiprecious stone, except such as are cut into shapes and forms fitting them expressly for use in the construction of jewelry, not specially provided for, 25% ad val.

PAR. 1811. Works of art * * * artistic antiquities, and objects of art of ornamental character or educational value which shall have been produced prior to the year 1830, but the free importation of such objects shall be subject to such regulations as to proof of antiquity as the Secretary of the Treasury may prescribe. * * * [Free.]

SEC. 489. ADDITIONAL DUTIES.

*        *        *        *        *        *        *

* * * If any article described in paragraph 1811 and imported for sale is rejected as unauthentic in respect to the antiquity claimed as a basis for free entry, there shall be imposed, collected, and paid on such article, unless exported under customs supervision, a duty of 25 per centum of the value of such article in addition to any other duty imposed by law upon such article.

At the trial, it was agreed that the articles involved herein were "artistic" within the meaning of paragraph 1811 and that the customs regulations relative to free entry under said paragraph had been complied with. Counsel for the plaintiff stated further that no claim was made as to the ivory base of the incense burner.

In support of his claim, plaintiff called Mitsue Watanabe, president of the Oriental Art Gallery Co., Ltd., of Tokyo, who testified, through an interpreter, as follows: He brought the instant merchandise with him when he came to this country a year and half previously, at which time Shozo Saito, the plaintiff herein, accompanied him as his personal interpreter. He (Watanabe) has been in the business of dealing in oriental antiquities, precious metals, and jewelry for over 30 years. During all that time, he has handled both modern and antique jade, has dealt with museums in Japan, and has visited several American museums. He has read reference books and catalogs of

art objects. In the course of his business, he has handled several thousand pieces of antique jade. He obtained his knowledge of the antiquity of jade objects through personal experience in his business, comparing catalogs with the actual merchandise, and studying articles brought in from China.

The witness testified that the object described on the invoice as an incense burner is called Koro or incense burner in the Orient, although it is not actually used for burning incense, but is an object of art. In his opinion, it belonged to the period called Ken-ryu, that is, about 250 years ago. He said that the description on the invoice referring to it as Ming period was in error; that it should have been Shin period. He explained that the Shin period or era followed the Ming period in China; that there were about five periods during the Shin era, and that the Ken-ryu period was one of them. All Ken-ryu jade objects were made in China and are so known to the trade because nothing like them was made after that period. The witness believed that the incense burner herein belonged to the Ken-ryu period because it was in the style of objects made in that period and because jade, after that time, was manufactured into much smaller pieces. He explained:

The area in which Chinese jades are produced is called Un-nan province, and Burma in the early days. That is a thousand years ago, and from my study the commonly recognized theory is that during the Ken-ryu period the finest jade was mined in China, and history also tells us that was the period in which the Chinese civilization was at the apex, and people in that era dealt in luxuries. An emperor of that period had artists and craftsmen make fine articles such as these. Jade, after that period, was manufactured into much smaller pieces, not in large sizes as these, because of its value.

In the opinion of the witness, the Buddhist statue and the screens were also of the Ken-ryu period because of their style and carvings.

On cross-examination, there was introduced into evidence a certification of one Shinro Tayama, who was apparently connected with the National Museum in Tokyo, stating, among other things, that the within articles were not national treasures or important objects of art and that they belonged to the Ming period (defendant's exhibit A). The witness Watanabe stated that this document was prepared pursuant to his instructions and advice.

Watanabe testified also that any object made in the Ken-ryu period is called an old jade product, but that a product made in or about the year 1850 would also be antique jade. He said that the characteristics of the within articles which indicated that they belonged to the Ken-ryu period were the manner of carving, the size of the jade, its quality, and the fact that such objects were not made in later periods. He explained that jade of this size is still being produced but not of this quality, being much whiter in color. He thought carvings of this kind could be made at the present time by skilled workmen,

but "in late years they don't make these foolish things, because it takes a long time to carve it out." In his opinion and based upon his knowledge, there must have been craftsmen available in ·China in or about 1850 capable of producing jade carved in this fashion; therefore, these jade articles could have been made in or about the year 1850. Objects of this type were mostly made in the Ken-ryu period, but they have also been made in other periods.

At a subsequent hearing, defendant called Robert R. Lee, examiner of merchandise at San Francisco. At the conclusion of his testimony, after argument as to his qualifications, the following occurred:

MR. LAWRENCE: I move to strike the testimony of this witness relative to antiquity of the articles not involved for lack of qualifications shown.

JUDGE MOLLISON: All right, the motion is allowed. The testimony is stricken.

Plaintiff claims in his reply brief that all of the testimony of the witness was stricken. We do not so interpret the ruling of the trial judge.

The witness Lee stated that he had been examiner of fine arts since 1946 and of antiques and semiprecious stones since 1948 and had examined numerous jade articles, both ancient and modern. He said that he had examined the merchandise involved herein and described it as follows:

The incense burner was in the form of a teapot-shaped object, or bowl with the form of a teapot on three legs, with masks carved at the top of the three rather short, stubby legs; a removable top with a lion upon it, not the usual, highly conventionalized dog or Chinese lion but a very naturalistic or realistic one. And also it had a similar lion carved in high relief on the side. It was green jade. The body of the thing, except for the lion and high relief, was not carved. In addition to that, I forgot one additional thing, there were two masks which were carved from the same piece of jade on the body of it. And the bottom, I forgot to mention, had a seal which I identified by comparing with copies of seals of various periods in standard books, a seal of the Ch'ien Lung period, a seal attributing it to the Ch'ien Lung period.

The witness explained that the Ch'ien Lung period was the same period as that referred to by the previous witness as the Ken-ryu period. He stated also that the incense burner was about 6 inches high. A photograph thereof was introduced into evidence as defendant's illustrative exhibit B. The witness described the other articles as "a figure of a Buddha sitting upon a lily pad with a thinly carved nimbus behind of approximately 8 inches high" and " two ovoid·jade screens carved in bas-relief about 6 inches in the shorter and approximately 8 inches in the larger dimension."

Examiner Lee also testified that he had reported the merchandise as having been produced subsequent to 1830 because of the artistic nature of the articles and because the carving was not typical of the earlier period. He was not permitted to testify further as to the age

of the articles or the characteristics which he believed were indicative of a given age.

Defendant's second witness was Martin S. Rosenblatt, vice president of Gump's, Inc., an art store in San Francisco, who testified as follows: He has been employed by Gump's since 1919 and is now in charge of the oriental department, including the jade rooms. He buys and sells antiquities, modern curios, jade, porcelains, and bronzes, both antique and modern. His firm purchases from cutters in China, from antiquarian dealers in China, from private parties, and also buys the raw stone from miners and has it cut into jade. He has traveled to the Orient eight times and has visited museums in the United States, making a special study of jade collections, in particular the Bishop collection at the Metropolitan Museum of Art. He has studied with Dr. Alfred Salmone, an expert on antique jade, and has communicated and studied with the collectors of many museums. He became familiar with the Ch'ien Lung period, through his travels and his studies of museums and collections, and especially by studies with Chinese experts and carvers, who explained in great detail the differences between antique jade carvings and modern jade carvings and the changes in materials used in these carvings.

This witness had examined the merchandise involved herein at the request of Examiner Lee and in his presence. In his opinion, the carving of the articles was of modern quality. He explained:

The details of hair, the details of the coils of the lion, are not cleanly, softly, exactly, microscopically done. In proper antique carving there will be no fusing of lines. The lines will be clean. They will terminate properly. The edges are smooth and clean. There is no roughness, there is no sharpness, nor irregularity. * * *

* * * * * * * * 

* * * If the lines terminate cleanly the cutting instruments will terminate exactly with the design. They will not go off roughly into a scratch mark that is not inherent in the design.

The witness stated that he found that the articles involved herein were roughly done and were not smooth. He added that the design of the animal was not that of an antique jade animal, being more naturalistic or graphic than was the custom prior to 1830. He stated that the details, such as the claws, eyes, and tail, indicated that it was not a product made prior to 1830.

As to the Buddha statue, the witness stated that the quality of the workmanship and of the carving was definitely inferior to the standard of works of art in jade produced prior to 1830. He explained that all articles produced prior to 1830 had clean edges, but they were not raw or sharp to the finger. He added that the thinness of the halo was definitely different from that of 18th century pieces, and that the quality of the features showed a lack of the fine craftsmanship always maintained in antique jade pieces.

The witness also believed that the jade screens were not produced prior to 1830 because the quality of the cutting, the abrasive work, was not equal to the known standards prior to 1830. He explained that the essential difference between antique jade cutting and modern jade cutting is in the abrasive; that, prior to 1830, the abrasive used was finely powdered ruby dust, which did not have the speed of the modern corundum dusts which have been imported into China. He said that there was no instance known to him of the use, prior to 1830, of fast-cutting abrasives which would give raw, biting edges.

In the opinion of the witness, work produced prior to 1830 could lack details but never quality. In fact, he had never seen articles of inferior workmanship made prior to that date. The reason, he said, was that jade work was made for religious and for official use and always had to attain a standard of quality and perfection.

Counsel for the Government stated at the conclusion of Mr. Rosenblatt's testimony that he had another witness, one Scotty Tsuchiya, owner of an antique shop dealing in jade, who had examined the articles and who would testify in almost all respects along the same lines as Rosenblatt. It was agreed that if he were called, he would so testify with respect to the antiquity of the articles.

Since plaintiff claims that the articles involved herein are entitled to free entry as artistic antiquities produced prior to 1830, he is charged with the burden of proving such antiquity by a preponderance of evidence. *Sumner Healey* v. *United States*, 67 Treas. Dec. 883, T. D. 47727; *Mattoon & Co.* v. *United States*, 71 Treas. Dec. 149, T. D. 48777; *Grace Nichols* v. *United States*, 73 Treas. Dec. 937, T. D. 49610; *Grant Art Galleries* v. *United States*, 2 Cust. Ct. 341, C. D. 157.

In the instant case, plaintiff's witness Watanabe testified that the articles belonged to the Ken-ryu period, about 250 years ago, basing his opinion upon the manner of carving, the size and quality of the jade, and that such objects were not made in later periods. He admitted, however, that there must have been craftsmen available in China in later periods capable of producing jade carved in this manner, and that the articles could have been made in or about the year 1850. On the other hand, defendant's witness Rosenblatt was definitely of the opinion that the articles were produced subsequent to 1830 on the ground that the carving was of modern quality, not being as finely done or as smooth as older carvings; that the design of the animal was more graphic than was usual prior to 1830; that the features of the Buddha lacked fine craftsmanship; and that the abrasive work was not of the type done on older articles where ruby dust rather than corundum was used. Plaintiff attacks the credibility of this witness because he stated that "the only improvement in the jade industry of modern times has been fast cutting abrasives" and then testified

that articles produced after 1830 were of inferior workmanship. We are not in accord with this contention. The use of a fast-cutting abrasive may have been an improvement insofar as speed of production is concerned, but it would not necessarily result in a better quality product.

Since the testimony of defendant's witness was far more positive than that of plaintiff's witness, and since the former described in much greater detail the characteristics of the articles which influenced his opinion, we conclude that the weight of the evidence supports the claim of defendant that the articles were not produced prior to 1830. *Grant Art Galleries* v. *United States, supra.*

Since the articles involved herein were of the kind described in paragraph 1811, *supra,* and were rejected "as unauthentic in respect to the antiquity claimed as a basis for free entry," and since there is no evidence that they were imported other than for sale or that they were exported under customs supervision, they were properly assessed with additional duty under section 489, *supra. Angelo Oliva, Ltd.* v. *United States,* 23 C. C. P. A. (Customs) 161, T. D. 48012; *Thomas & Pierson, Inc.* v. *United States,* 25 C. C. P. A. (Customs) 56, T. D. 49042.

For the reasons stated, the protest is overruled, and judgment will be rendered for the defendant.